```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____
ALEJANDRO MOLINA,

                    Plaintiff,              08-CV-6370

            v.                              DECISION
                                            and ORDER
COCA-COLA ENTERPRISES, INC.,

                    Defendant.
_____
```

## **INTRODUCTION**

Plaintiff Alejandro Molina ("Molina" and/or "plaintiff") brings this action against defendant Coca-Cola Enterprises, Inc. ("CCE" and/or "defendant") alleging the following: employment discrimination and retaliation on the basis of national origin in violation of the Civil Rights Act of 1991, 42 U.S.C. §1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq., as amended ("Title VII"), and the New York State Human Rights Law, §290 et seq. ("HRL"). Plaintiff seeks general and compensatory damages, punitive or exemplary damages as well as attorney's fees and costs.

Defendant has moved to compel arbitration of this action and/or stay or dismiss this proceeding pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq. (2000) and Rule 12(b) of the Federal Rules of Civil Procedure, on the grounds that plaintiff entered into a binding arbitration agreement with CCE when he was initially employed and when CCE implemented the "Solutions" Program, which requires plaintiff to litigate the instant dispute with CCE and/or its employees in that forum. Plaintiff does note dispute that the arbitration agreement is governed by the FAA. However, plaintiff contends that the

agreement is unenforceable because it is unconscionable. Plaintiff claims he has an inability to understand and speak English and as such he did not understand the terms of the arbitration agreement.

For the reasons that follow, the motion to compel arbitration and to stay this action pending the arbitration is granted. The motion to dismiss is denied without prejudice.

**BACKGROUND**

### I. Factual History

The following facts are taken from the Complaint ("Compl."), the Affidavit of Melanie Lewis ("Lewis Aff.") filed in support of the instant motion, the Declaration of Attorney Christina A. Agola ("Agola Decl.") filed in opposition, and the exhibits attached thereto.[1] The facts drawn from plaintiff's complaint are not findings of fact by the Court, but rather assumed to be true for the purpose of deciding this motion and construed in the light most favorable to plaintiff, the non-moving party.

### A. Plaintiff's Employment at CCE

CCE[2] employed plaintiff from July 6, 2004 until his termination on or about February 6, 2008. See Compl., ¶8. In connection with his application for employment with CCE, plaintiff executed a written

---

[1] The Court may properly consider documents outside of the pleadings for purposes of deciding a motion to compel arbitration. See Brown v. Coca-Cola Enterprises, Inc., 2009 WL 1146441, at *1 n.1 (E.D.N.Y.2009) ("While it is generally improper to consider documents not appended to the initial pleading or incorporated in that pleading by reference in the context of a Rule 12(b)(6) motion to dismiss, it is proper (and in fact necessary) to consider such extrinsic evidence when faced with a motion to compel arbitration.") (quoting BS Sun Shipping Monrovia v. Citgo Petroleum Corp., 2006 WL 2265041, at *3 n. 6 (S.D.N.Y.2006) (citation omitted).

[2] CCE is a corporation engaged in the bottling and distribution of Coca-Cola products. See Lewis Aff., ¶4.

arbitration agreement on June 10, 2004 indicating that he agreed to arbitrate any and all employment related disputes with CCE. See Lewis Aff., ¶10. The arbitration agreement provides in pertinent part:

> If there should be any disagreement arising out of this application for employment, it is important for both of us to be able to address that disagreement expeditiously and fairly. Therefore, this arbitration agreement requires you and us, Coca-Cola Enterprises Inc. and its subsidiaries and affiliated companies ("CCE"), to arbitrate any legal claim related to your application for employment, the hiring decision, or your subsequent employment with CCE.
>
> ...
>
> CCE and I agree that any claims that arise between us will be resolved in accordance with this arbitration agreement unless CCE, upon notice, adopts a different alternative dispute resolution program (such as "Solutions:, which applies only to Employees, as defined therein) in which case that program (including its rules), to the extent of its terms, shall supersede and replace this arbitration agreement, and I agree to be bound by said program.

See Lewis Aff., ¶10, Ex. A.

Plaintiff is an Hispanic male who worked at CCE's Rochester, New York facility initially as a Truck Loader and subsequently as a Machine/Forklift operator. See Complt., ¶8. According to the Complaint, plaintiff has been subject to disparate and discriminatory treatment by CCE from the beginning of his employment. See id., ¶9. Plaintiff claims that his work schedule did not require him to work every Friday. However, plaintiff asserts that he was compelled to work on Fridays under the threat of discipline while non-Hispanics were not so

similarly treated. See id., ¶10.[3] In addition, plaintiff and other Hispanic employees who spoke Spanish communicated over the walkie-talkie system in Spanish during the 2nd shift. See id., ¶12.

Plaintiff claims there was no policy, written or otherwise, that prohibited plaintiff and other Hispanic co-workers from communicating in Spanish. However, some non-Hispanic employees complained to the Production Manager regarding Molina and his co-workers speaking in Spanish over the walkie-talkie system. See id., ¶14. On or about October 11, 2007, the Production Manager called a meeting to convene the 2nd shift employees including Molina and his Hispanic co-workers. See id., ¶15. According to the Complaint, plaintiff and his Hispanic co-workers were admonished by the Production Manager and told to stop speaking Spanish in the workplace, throughout the facility and on the walkie-talkies under the direct threat of disciplinary action including termination. See id., ¶16. Plaintiff claims he complained that the rule was unfair but the Production Manager replied that it was rude to speak Spanish and that he felt that Hispanic employees, including plaintiff were making innuendos about the non-Hispanics behind their backs. See id., ¶17.[4] The policy of prohibiting plaintiff and other Hispanic employees from speaking Spanish was commonly referred to as the "English only rule." See id., ¶19.

---

[3] Plaintiff also claims non-Hispanics were granted time off when they requested it for their family members, but plaintiff claims he was consistently denied time off to care for his infant son. See id., ¶11.

[4] According to the Complaint, the non-Hispanic employees began to berate the plaintiff by saying "you can only speak English here...." and that Plaintiff cannot "speak Spanish anymore" while mocking the manner in which Plaintiff spoke English (i.e. with a heavy Spanish accent). See id., ¶18.

-4-

After the Production Manager failed to take remedial action with respect to Molina and his co-workers, plaintiff went to the Human Resources Department and complained to the Director of Human Resources. See id., ¶20. However, the Director of Human Resources failed to take any remedial action since the "English only rule" continued to be enforced. See id., ¶21. Plaintiff claims that he was suspended in November 2007 because he complained about discrimination in the workplace. See id., ¶22. On November 28, 2007, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination and retaliation based on national origin. See id., ¶23. In January 2008, plaintiff states that he became ill and was told by the doctor to stay home for two days. See id., ¶24. However, according to plaintiff defendant denied his medical leave and was warned that he could be terminated if he took any time off from work. See id., ¶25. Defendant ordered plaintiff to get a new note from his doctor indicating that plaintiff could work light duty. Plaintiff followed this order and yet defendant then failed to permit plaintiff to work light duty. Accordingly, after two days defendant told plaintiff to work his regular job. See id., ¶26. According to the Complaint, for the next several weeks, plaintiff was intimidated by his immediate supervisor. See id.

### B. The "Solutions" Program and CCE's Introduction of the Program to Plaintiff

On March 8, 2006, CCE informed employees throughout its Northeast Business Unit, which includes the Rochester facility that CCE was

implementing a conflict resolution program known as the Solution Program. See Lewis Aff., ¶¶11 &12, Ex. B. A copy of the letter was mailed to plaintiff's home address. See id., ¶¶ 12&13, Exs. C-D.[5] The letter also stated to plaintiff and his co-workers that CCE was adopting the Solutions Program as "the exclusive means of resolving workplace conflict" and that the program would become effective in the Northeast Business Unit in May 1, 2006. See id., ¶12, Ex. B. In addition, the letter informed plaintiff that as of the effective date of the program's implementation, both CCE and its employees in the Northeast Business Unit would "agree to resolve all legal claims and other workplace conflicts through Solutions rather than through court." See id.

The mailing enclosed a program brochure, as well as a summary program description ("SPD"). See id. The brochure described the four conflict resolution options available through Solutions, including arbitration, stating that "disputes which are not resolved in Talk, Support or Mediation will be finally solved in Arbitration rather than in court. If an employee files a lawsuit against [CCE], the Company will ask the court to dismiss the lawsuit and refer it back to Solutions." See id. ¶13, Ex. C at 7. The brochure also stated that "all employees who accept or continue employment with the Company agree to resolve all legal claims against the Company or an employee through

---

[5]According to defendant, the documents sent to Molina gave him a broad overview of the Solutions Program, including the role that arbitration would play as the mandatory, binding dispute resolution mechanism for legal claims in lieu of pursuing such claims in court. See id., Exs. B-D.

Solutions rather than through court." See id., at 2. In addition, the Solutions Program plan specifies that Solutions applies to all disagreements and claims "between any persons and/or entities bound by this Program." See id., ¶14, Ex. E, at 2.

The Solutions SPD mailed to Molina also explained the Solutions options in more detail, specifying that "Solutions applies to all workplace Conflicts, including Legal Disputes, among or between [CCE] and any person covered by the program. In Solutions, the terms 'Conflicts' and 'Legal Disputes' have special meanings. Conflicts are controversies or disagreements of any nature, including Legal Disputes. Legal Disputes are claims, demands, and controversies involving the potential violation of rights under statute, regulation, or other law." See id., ¶13, Ex. D., at 1. The SPD also reiterated that an employee's continued employment with CCE after the implementation of Solutions constituted the employee's acceptance of the program. Specifically, the description stated that "[y]ou are covered by Solutions if you are employed by the Company on or after the Effective Date of the program" and reiterated that "by accepting or continuing employment with the Company after the Effective Date of the program, you agree to use Solutions to resolve any Legal Disputes or other Conflicts with the Company or any employee through Solutions rather than through court." See id.

On April 25, 2006, the Rochester, NY facility conducted a "Solutions" orientation program. See id., ¶14. Molina's signature appears alongside his printed name on the sign-in sheet for this

orientation, and he does not dispute that he attended the session. See id., Ex. H. Each attending employee, including Molina received a copy of the Solutions Program plan document; the program "frequently asked questions" ("FAQ") document; and a copy of the PowerPoint presentation shown at the orientation session. See id., Exs. E-G. The employees at the orientation were also shown a Solutions orientation video. See id., ¶15. These materials explained the coverage of Solutions in more detail and also reiterated both the mandatory nature of arbitration in the program and the fact that employees who continued to work for CCE would be bound by Solutions. See id., ¶14, Exs. E-G. Indeed, the program plan document disseminated at the orientation stated as follows: "Except for some measures described in this document, the Solutions Program creates the only process for the final resolution of all Conflicts, including Legal Disputes, defined below. **Therefore no Conflict can be taken to court, taken before a jury, or otherwise be made the subject of a lawsuit**...." See id., Ex. E., at 1. (emphasis in original). In addition, the definition section of the Solutions Program plan document defines "Conflict" in part, as "any and all Legal Disputes," and "Legal Disputes," in turn, are defined, in part, as

> ...all legal and equitable claims, demands, and controversies, of whatever nature or kind, whether in contract, tort, under statute or regulation, or some other law, between persons and/or entities bound by this Program or by an agreement to resolve Conflicts under this Program. Legal Disputes can include...[a]ny contested matter or issue relating to the employment of an Employee, including the terms, conditions, and/or termination of employment with the Company;...[a]ny other matter related to the relationship between an Employee and the Company including, by way of example and without limitation, allegations of discrimination

> based on race... national origin; or... other kinds of unlawful harassment;... retaliation because of participation in or use of the Program's options; employee benefits;... or employee benefit program....

See id., Ex. E at 3.

The Solutions Program plan document also contains a section entitled "Assent" that states that "[e]mployment or continued employment after the Effective Date of this Program constitutes consent by both the Employee and the Company to be bound by this Program, both during the employment and after termination of employment." See id., Ex. E at 11. The FAQ document also stressed both the mandatory and binding nature of arbitration under the Solutions Program and that employees that continued employment with CCE agreed to resolve conflicts through Solutions rather than through the court system. See id., Ex. F, at 2. Further, defendant contends that the orientation video contained a section in which the narrator stated "by accepting or continuing employment with the Company, we all agree to resolve workplace issues using Solutions. This means that any issue not resolved in Talk, Support, or Mediation will be resolved in Arbitration." See id., ¶15.

After receiving the Solutions materials and attending the orientation, plaintiff remained an employee of CCE for more than twenty-one months following the May 1, 2006 effective date of the Solutions Program. See Compl., ¶8. Defendant argues that instead of proceeding to mandatory arbitration under the Solutions Program, plaintiff filed the instant action on August 15, 2008 in which he

alleges unlawful employment discrimination based on his national origin as well as retaliation.

## DISCUSSION

### I. Standard of Review

"[T]he summary judgment standard is appropriate in cases where the District Court is required to determine arbitrability, regardless of whether the relief sought is an order to compel arbitration or to prevent arbitration." See Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir.2003);[6] see also 9 U.S.C. § 4 (1999). The summary judgment standard, set forth in Fed.R.Civ.P. 56(c), provides that summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." See Fed.R.Civ.P. 56(c); see also Bensadoun, 316 F.3d at 175-78; Oppenheimer & Co., Inc. v. Neidhardt, 56 F.3d 352, 358 (2d Cir.1995). If the moving party has "substantiated the entitlement [to compel arbitration] by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried." See Oppenheimer, 56 F.3d at 358; see also Bensadoun, 316 F.3d at 175- 78; Doctor's Ass'n., Inc., v. Distajo, 944 F.Supp. 1010, 1014 (D.Conn.1996), aff'd, 107 F.3d 126 (2d Cir.1997), cert. denied, 522 U.S. 948 (1997) ("A party resisting arbitration... must show that, if proven, [its] allegations would relieve any obligation to arbitrate, and [it] must produce some evidence to

---

[6] In Bensadoun, the Second Circuit held that irrespective of the absence of a dispositive motion, district courts should apply the summary judgment standard when faced with the question of whether to stay or compel arbitration. See id. at 175.

substantiate [its] factual allegations") (internal citations and quotation marks omitted).

Under this standard, if the record presented requires that the issue of arbitrability be resolved against the plaintiff, the petition may properly be dismissed or stayed and arbitration compelled. See Bensadoun, 316 F.3d at 175. But "[i]f there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary" before a determination on arbitrability can be made. See id.; see also Brown, 2009 WL 1146441, at * 5. "An alleged factual dispute regarding immaterial or minor facts between the parties will not defeat...summary judgment." See Powell v. National Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir.2004) (citation omitted).

**II. Plaintiff's Claims Are Covered By The Mandatory Arbitration Provision of CCE's Solution Program**

CCE moves to compel arbitration and stay or dismiss this action contending that the parties are bound by an agreement to arbitrate. Plaintiff argues that he should not be bound by the agreement to arbitrate employment-related disputes because he "does not read English, does not write English, and barely understands English." See Pl. Br. at 6. For the reasons set forth below, the Court finds that plaintiff's continued employment with CCE after the implementation of the "Solutions" program constituted an acceptance of its terms, which included an agreement to arbitrate any disputes such as the one presently before this Court. Thus, CCE's motion to compel arbitration is granted and the Court will stay this lawsuit, rather than dismiss it, pending arbitration.

**A. Federal Arbitration Act**

The FAA, 9 U.S.C. § 1 et seq., reflects a liberal policy favoring enforcement of arbitration agreements and grants district courts authority to compel arbitration where the parties have agreed to arbitrate. See 9 U.S.C. §4; see also Garten v. Kurth, 265 F.3d 136, 142 (2d Cir.2001) (It is well-settled that the FAA generally requires that courts resolve issues of arbitrability in favor of arbitration); CPR (USA) Inc. v. Spray, 187 F.3d 245, 254 (2d Cir.1999) ("The existence of a broad agreement to arbitrate...creates a presumption of arbitrability, which is overcome only if 'it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'") (quoting WorldCrisa Corp. v. Armstrong, 129 F.3d 71, 74 (2d Cir.1997)). The FAA also grants authority to district court to stay an action commenced in federal court pending the outcome of arbitration. See 9 U.S.C. §3.

In determining whether to compel arbitration, the Second Circuit has instructed that a court is obliged to consider four factors: (1) whether there has been an agreement to arbitrate; (2) whether the scope of the arbitration agreement covers the dispute at issue; (3) if federal statutory claims exist, whether Congress intended those claims to be non-arbitrable; and (4) if only some of the claims are subject to arbitration, whether the court should stay the remaining claims pending arbitration. See JLM Indus. v. Stolt-Nielsen SA, 387 F.3d 163, 169 (2d Cir.2004); Oldroyd v. Elmira Sav. Bank, FSB, 134 F.3d 72, 75-76 (2d

Cir.1998); see also Genesco, Inc. v. T. Kakiuchi and Co., Inc., 815 F.2d 840 (2d Cir. 1987). In this case, Molina does not dispute that the scope of the agreement in question properly encompasses the instant dispute and that the statutory claims implicated are arbitrable.[7] Accordingly, the remaining question to be addressed by the court is the agreement to arbitrate given plaintiff's unconscionability argument.

### B. Plaintiff's Unconscionability Argument is Not Supported by the Evidence

Plaintiff argues that the arbitration agreement is unconscionable so as to be unenforceable and therefore, he could not have assented to be bound by its terms. Specifically, plaintiff submits that he should not be bound by the agreement to arbitrate because he "does not read English, does not write English, and barely understands English." See Pl. Br. at 6. Plaintiff has provided no evidence to support his claim of unconscionability.[8] Further, the law is clear that "a mandatory arbitration clause is a reasonable means by which an employer can seek to protect itself from protracted litigation" and is not, by itself, unconscionable. See Gonzalez v. Toscorp Inc., 1999 WL 595632, at *3 (S.D.N.Y.1999) (citing Sablosky v. Gordon Inc., 73 N.Y.2d 133, 138 (N.Y.1989)); see also Gilmer v. Interstate Johnson Lane Corp., 500 U.S. 20, 33 (1991) ("Mere inequality in bargaining power, however, is not a

---

[7] It is well settled that statutory discrimination claims can be the subject of an arbitration clause. See e.g. Desiderio v. National Ass'n of Secs. Dealers, Inc., 191 F.3d 198, 204-05 (2d Cir.1999) (finding Title VII claims arbitrable); Fletcher v. Kidder, Peabody & Co., 81 N.Y.2d 623, 635 (1993) (finding discrimination claims under New York Executive Law §296 arbitrable).

[8] Plaintiff has provided no admissible evidence that he cannot read or understand English. As distinguished from the one case plaintiff cited in his brief where those plaintiffs submitted sworn affidavits evidencing their inability to read English at the time they signed the applicable arbitration agreement. See Prevot v. Phillips Petroleum Co., 133 F.Supp.2d 937, 940 (S.D.Tex.2001).

sufficient reason to hold that arbitration agreements are never enforceable in the employment context"). In addition, arbitration agreements, such as the one before the Court, that recognize continued employment as assent to contractual terms, have been upheld and enforced by numerous courts, and this Court agrees with the reasoning and analysis contained in those decisions, which apply to the circumstances here. Accordingly, given the absence of any evidentiary proof of plaintiff's claims, plaintiff's unconscionability argument fails.

As stated above, an agreement to arbitrate creates a presumption of arbitrability. In deciding whether parties agreed to arbitrate a certain matter, a court should generally apply state-law principles to the issue of contract formation. See Mehler v. Terminix Int'l Co., 205 F.3d 44, 48 (2d Cir.2000); see also Specht v. Netscape Comm. Corp., 306 F.3d 17, 27 (2d Cir.2002). In this regard, it is well established under New York law that "arbitration will not be compelled absent the parties' 'clear, explicit and unequivocal agreement to arbitrate.'" See Manigault v. Macy's East, LLC, 2009 WL 765006, at *2 (2d Cir.2009) (summary order) (quoting Fiveco, Inc. v. Haber, 11 N.Y.3d 140, 144 (2008)). Such agreement may be expressed formally through words, or through a party's conduct. See Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., 448 F.3d 573, 582 (2d Cir.2006) ("A contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the presumed intention of the parties as indicated by

-14-

their conduct. It is just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by conduct.") (quotation and internal citations omitted).

New York courts have determined that "[t]he conduct of a party may manifest assent if the party intends to engage in such conduct and knows that such conduct gives rise to an inference of assent." See Maas v. Cornell Univ., 94 N.Y.2d 87, 94 (1999) (internal citation omitted). In the employment context, "[a]n employee may consent to a modification to the terms of employment by continuing to work after receiving notice of the modification." See Manigault, 2009 WL 765006, at *2 (citation omitted); Bottini v. Lewis & Judge Co., 621 N.Y.S.2d 753, 754 (3d Dep't.1995); Waldman v. Englishtown Sportswear, Ltd., 460 N.Y.S.2d 552, 555 (1st Dep't.1983).

In this case, CCE has provided evidence that plaintiff can read, write and understand English. Affidavits from plaintiff's former supervisors demonstrate that in his various job duties plaintiff was able to review and comprehend information in English. In fact, in his most recent job as a Truck Loader, Molina was required, on a daily basis, to examine and understand order tickets to determine what products needed to be loaded on which trucks. See Declaration of Robert Schafer ("Schafer Decl."), ¶3. The order tickets had fairly detailed and specific information and were written entirely in English. See id., ¶4. Moreover, while working previously as a Forklift Operator, it was required that Molina complete verification of paperwork everyday, which

included his review and preparation of a checklist concerning the condition of the forklift, all of which were entirely in English. See Declaration of Diane Rood ("Rood Decl."), ¶5, Ex. 1; Declaration of Maureen Ortiz ("Ortiz Decl."), ¶5, Ex. 1. In addition, Molina's own personnel file contains documents completed by him in English. See Declaration of Tanja West Edwards ("Edwards Decl."), ¶4, Exs. 1-3; Ortiz Decl., ¶7, Ex. 2. Furthermore, the Complaint itself indicates that Molina communicated with CCE's employees in English during his employment. See Compl., ¶18. Accordingly, the Court finds that Molina's assertions that he cannot read, speak or understand English, without any documentary proof or evidence to the contrary, is without merit.

Notably, even if plaintiff could not read or understand English, his signature on the June 10, 2004 arbitration agreement would still be binding against him as his "execution of an agreement of this type under such circumstances constitutes gross negligence, since he failed to seek proper assistance in understanding it before signing." See Chemical Bank v. Geronimo Auto Parts Corp., 225 A.D.2d 461, 462 (1st Dept.1996) (granting summary judgment to signee despite signor's claim that he did not speak English and had been mislead as to the meaning of the contract where, under the circumstances, it was grossly negligent for him to do so). If plaintiff was not "sufficiently proficient in English to understand the significance" of the arbitration agreement, "it was incumbent upon him to make a reasonable effort to have the document explained to him." See Kassab v. Marco Shoes Inc., 282 A.D.2d 316 (1st Dept.2001) (enforcing sublease against signor who alleged he

was not proficient in English). The mere fact that plaintiff does not understand English is insufficient to set aside the arbitration agreement since he is presumed to know its contents and to have assented to its terms. See Garcia v. Konkul, 20 Misc.3d 139 (N.Y.Sup.App.Term.2008) (citing Sofio v. Hughes, 162 A.D.2d 518 (1990)); see also Imero Fiorentino Assoc. v. Green, 85 A.D.2d 419, 420 (1982). Cases have consistently held that a person who does not understand English must make a reasonable effort to have an agreement made clear to him. See Shklovskiy v. Khan, 273 A.D.2d 371, 372 (2000); Sofio, 162 A.D.2d at 520.

Plaintiff has not established that he took any steps to have the June 10, 2004 agreement read and made clear to him. Accordingly, Molina is bound by his signature on the June 10, 2004 arbitration agreement and is bound by the subsequently issued Solutions Program. Thus, CCE's motion to compel plaintiff to submit his claims to arbitration is granted.

## CONCLUSION

For the reasons set forth above, defendant's motion to compel arbitration and stay this action is granted. The motion to dismiss is denied without prejudice.

**ALL OF THE ABOVE IS SO ORDERED.**

s/Michael A. Telesca<br>
MICHAEL A. TELESCA<br>
United States District Judge

Dated:   Rochester, New York
         June 8, 2009